UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH GOMEZ,

          Plaintiff,

    v.

CAROLYN W. COLVIN,

          Defendant.

Case No. 15-cv-00281-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 25

## INTRODUCTION

Plaintiff Joseph Gomez (Plaintiff) brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Carolyn W. Colvin (Defendant), the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 19, 25. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record (AR), and relevant legal authority, the Court hereby **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion for the reasons set forth below.

## BACKGROUND

Plaintiff is a twenty-two-year-old that attended Thurgood Marshall Academic High School in San Francisco, from which he graduated in May 2012. AR 281-82, 415, 427. He received Supplemental Security Income (SSI) based on disability as a child. AR 20, 391, 429. Pursuant to applicable law, the Social Security Administration (SSA) redetermined Plaintiff's eligibility for disability benefits under the rules for determining disability in adults when he turned 18. *See* 20 C.F.R. § 416.987. SSA found Plaintiff was no longer disabled as of July 1, 2011. AR 116-20.

United States District Court
Northern District of California

**A.     Education Records**

The AR includes Plaintiff's education records from Thurgood Marshall, including his Individualized Education Program ("IEP").[1]  AR 414-28.  The IEP includes Plaintiff's IEP Status, stating that he qualifies for Special Education Services, and lists his disability as "Specific Learning Disability," characterized by "deficits in auditory processing, conceptualization and attention."  AR 416.  The IEP states Plaintiff's "disability will impact his ability to progress in the general curriculum, benefit from a large group instructional setting, and participate in general education curriculum without modification or accommodations."  *Id.*

In his first year of high school, from summer 2008 through summer 2009, Plaintiff failed all but two classes.  AR 281.  In fall 2009, his GPA was 1.1; in spring 2010, it was 2.1.  AR 282.  However, the IEP indicates Plaintiff's ability to interact with others and control his anger and frustration improved significantly as he progressed toward graduation; he made significant progress in his junior year, passing all of his classes; and he became eligible to play on the school baseball team because he improved his behavior and grades.  AR 419, 427.  He even considered enrolling in a college or a vocational program after graduating.  AR 426.

For the 2010/2011 school year, Plaintiff was to participate in all general education classes except for English, math, social studies, and science.  AR 424.  In fall 2010, Plaintiff got a D in reading; a C in integrated science; Bs in geometry, American literature, and study skills; and an A in United States history, resulting in a GPA of 2.6.  AR 281, 418.  In spring 2011, Plaintiff's GPA was 2.5; in summer 2011, it was 3.0; in fall 2011, it was 2.4; and in spring 2012, it was 2.7.  AR 281.

---

[1] An IEP is part of the Individuals with Disabilities Education Act, which "ensure[s] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  To achieve this goal, the Act relies on a cooperative process between parents and schools.  *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005).  Central to this cooperative process is the IEP, which is created for every disabled student and serves as a road map for the student's education.  *Id.* at 53-54; *see also* 20 U.S.C. § 1414.  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer*, 546 U.S. at 53.  State educational authorities have a duty to identify and evaluate disabled children and develop an IEP for each one.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

In a February 6, 2012 letter, Chloe Medina, the Department Head of Special Education and case manager for Plaintiff, wrote that Plaintiff was in Special Day Class program, which meant he was not in the General Education setting for any of his classes.  AR 414.  The school placed him in a more restrictive environment "because that is the level of support required by Joseph to be successful."  *Id.*  Ms. Medina noted Plaintiff's processing deficits had "not allowed him to make progress in reading and comprehension beyond a 2nd/3rd grade level."  *Id.*  While Plaintiff had made great progress in the several years she had worked with him, he still required much support and was "not yet able to function academically (or in the social environment of school) without a great deal of individualized structure and support."  *Id.*  She also noted Plaintiff had significant emotional factors that required individualized attention and support, and frequent shutdowns due to an inability to cope with frustration or other challenges.  *Id.*  Ms. Medina wrote that Plaintiff's "perception of stressors was exaggerated," which caused him to over react to input he found unpleasant.  *Id.*

**B.      Medical Records**

Plaintiff received treatment from the City and County of San Francisco, Department of Public Health, Community Behavioral Health Services, Child, Youth, and Family System of Care, from December 4, 2006 through November 23, 2009.  AR 283-351.  On December 4, 2006, he was diagnosed with Disruptive Behavior Disorder, NOS,[2] R/O (Rule Out) Attention Deficit Hyperactivity Disorder (ADHD) combined type, R/O Post-Traumatic Stress Disorder (PTSD), R/O Reading Disorder.  AR 296.  On April 30, 2007, he was diagnosed with Learning Disorder NOS, Impulse Control Disorder NOS, and Disruptive Behavior Disorder, R/O ADHD, R/O Oppositional Defiant Disorder, R/O Intermittent Explosive Disorder.  AR 312.  On November 20, 2008, Plaintiff was diagnosed with Disruptive Disorder NOS, R/O Reading Disorder, R/O ADHD.  AR 292-93.

On March 23, 2010, Chandra Thomas, LMFT, and Alison Lustbader, LCSW, prepared an

---

[2] "NOS" means "Not otherwise specified."  *See* http:// askthepsych.com/atp/2008/03/10/ personality-disorder-diagnosis/.  "Using NOS is the clinician's way of saying there is a diagnosis in this general category but I don't have enough information to make a specific diagnosis yet." *Id.*, by Joseph M. Carver, Ph.D.

AB3632 Mental Health Assessment.  Thomas and Lustbader wrote that Plaintiff "continues to show signs of behavioral and emotional characteristics that impair his ability to function in his education program."  AR 357.  They recommended he be "referred for outpatient mental health services," that "his family be included in the counseling services," and recommended collateral contact with Plaintiff's school staff.  *Id.*

Plaintiff received treatment from Clementina L. Manio, M.D., from September 8, 2009 through September 16, 2010.  AR 361-66.  The record shows no significant physical health problems.

On May 26, 2011, consultative examiner Tania Shertock, Ph.D., completed an evaluation and Wechsler Adult Intelligence Scale-IV test.  AR 367-71.  In her June 4 report on the test, Dr. Shertock noted Plaintiff was a "[w]ell-nourished male in obvious distress," who was "[s]ullen and somnolent," but still "[a]lert and oriented."  AR 368.  She reported no impairment in gait, psychomotor agitation, or retardation.  *Id.*  Dr. Shertock also reported Plaintiff's affect was "Full Range-mood congruent" and his speech was "[n]ormal volume and rate," with "[n]o impairment in receptive and expressive language."  *Id.*  Plaintiff "denied current auditory hallucinations or illusions," and "he did not appear internally preoccupied."  *Id.*  Dr. Shertock noted Plaintiff's thought process was "grossly logical, organized, and coherent.  It revealed no loosening of associations, circumstantiality, or tangentiality."  *Id.*  As to Plaintiff's memory, Dr. Shertock found it was "[g]rossly intact."  *Id.*  Plaintiff did not appear to be distracted during testing and "maintained persistence in all activities."  *Id.*  However, she found his "Fund of General Information" was "[w]ell below average" and his insight and judgment were "limited."  *Id.*

The results of the Wechsler Adult Intelligence Scale-IV showed Plaintiff had a Full Scale IQ of 69.  AR 369.  Dr. Shertock wrote, "A FSIQ of 69 was obtained placing him in the mild range of mental retardation.  This is a reasonably valid and reliable estimate of his current intellectual functioning."  *Id.*  Dr. Shertock diagnosed Plaintiff with Posttraumatic Stress Disorder, Learning Disorder NOS, Dysthymic Disorder, Mild Mental Retardation, and found his Global

United States District Court
Northern District of California

4

Assessment of Functioning (GAF) was currently 45.[3]  AR 369-70.  Dr. Shertock found Plaintiff "appear[ed] to be unable to maintain consistent concentration, persistence, and pace and [was] able to perform simple repetitive tasks however not on a sustained basis and [was] not able to perform detailed and complex tasks."  AR 370.  She also found he "may have difficulty adapting to work stress and changes and would have difficulty maintaining a schedule on a consistent basis."  *Id.*  However, she found he "was able to relate well in the interview and would be able to appropriately interact with supervisors and co-workers in a job setting."  *Id.*

On July 15, 2011, medical consultant Uwe Jacobs, Ph.D., completed a "Mental Residual Functional Capacity Assessment."  AR 372-74.  Dr. Jacobs found Plaintiff "Not Significantly Limited" in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  AR 372-73.

Dr. Jacobs found Plaintiff "Moderately Limited" in the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make

---

[3] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) (DSM-IV-TR).  A GAF of 41 to 50 is consistent with a serious impairment in occupational, social, or school functioning.  *Id.*

1   plans independently of others.  *Id.*

2       Dr. Jacobs found Plaintiff "Markedly Limited" in the ability to: interact appropriately with

3   the general public.  AR 373.  In the "Remarks" section of the report, Dr. Jacobs wrote: "The

4   claimant can understand, remember and carry out simple and some detailed but not complex

5   instructions.  The claimant can sustain CPP for simple tasks only.  The claimant can get along with

6   others but not work effectively with the public.  The claimant can adapt to the stress and changes

7   of a simple work environment."  AR 374.

8       Dr. Jacobs also completed a "Psychiatric Review Technique" form on July 15, 2011.  AR

9   376-90.  Dr. Jacobs determined[4] that a Residual Function Capacity ("RFC")[5] assessment was

10  necessary.  AR 377.  In support of this disposition, Dr. Jacobs checked boxes for "12.02 Organic

11  Mental Disorders" and "12.08 Personality Disorders."  *Id.*  As to the Organic Mental Disorder, Dr.

12  Jacobs checked the box: "A medically determinable impairment is present that does not precisely

13  satisfy the diagnostic criteria above."  AR 378.  As to Personality Disorders, Dr. Jacobs checked

14  the box: "A medically determinable impairment is present that does not precisely satisfy the

15  diagnostic criteria above."  AR 384.  Dr. Jacobs found Plaintiff had mild restrictions of daily

16  living; moderate difficulties in maintaining social functioning; and moderate difficulties

17  maintaining concentration, persistence, or pace.  AR 387.  Dr. Jacobs concluded Plaintiff's

18  medical source statement and post-traumatic stress disorder diagnosis were likely "speculative or

19  overly restrictive," as Plaintiff was not in any treatment, and had "primarily social problems, not

20  psychiatric or neuropsychological ones."  AR 389.  Dr. Jacobs determined Plaintiff was "limited to

21  simple work with limited public contact."  *Id.*

22       On July 26, 2011, A. Mello filed a "Case Analysis" on form "SSA–416."  AR 391-94.  A.

23  Mello explains that at the date of the last favorable decision, October 13, 2006, Plaintiff's Primary

24  Diagnosis was Learning Disorder and his Secondary Diagnosis was Oppositional/Defiant

25

26  _____

27  [4] If impairment does not meet a listed impairment, an assessment and finding are made about
    residual functional capacity based on all the relevant medical and other evidence in the case
    record. 20 C.F.R. § 404.1520(e).

28  [5] RFC refers to what an individual can do in a work setting, despite mental or physical limitations
    caused by impairments or related symptoms.  20 C.F.R. § 404.1545(a)(1).

United States District Court
Northern District of California

Disorder.  AR 391.  A. Mello also noted that at the last favorable decision, Plaintiff's IQ score was 73.  *Id.*  In addition, formal testing at the consultative exam yielded results suggesting learning disorder with "potential average intellectual ability but very poor reading ability."  *Id.*

On October 17, 2011, K. Ying, M.D., completed a "Psychiatric Review Technique" form, which incorporated the same findings as the previous review by Dr. Jacobs on July 15, 2011.  AR 396-409.  Dr. Ying also completed a "Mental Residual Functional Capacity Assessment" form, incorporating the same findings as the July 15 report by Dr. Jacobs, except as to "[t]he ability to interact appropriately with the general public," in which Dr. Ying found Plaintiff to be "Moderately Limited" in contrast to Dr. Jacob's finding of "Markedly Limited."  AR 410-13.

Plaintiff received treatment from North East Medical Services in San Bruno, California, from March 13 through April 4, 2013.  AR 432-41.  The treatment notes include an "Initial Behavioral Health Assessment," dated April 4, 2013 by Pan Gu, LCSW.  AR 432-34.  In his "Mental Status" assessment, Mr. Gu noted Plaintiff's appearance was "appropriate," and Plaintiff was "oriented to person, place and time."  AR 433.  He described Plaintiff's behavior as "unremarkable," and his speech and affect as "appropriate."  *Id.*  Mr. Gu found Plaintiff's "[s]ensorium is clear consciousness," his attitude was cooperative, and his reasoning was fair.  *Id.*  He also found Plaintiff's self-perception was realistic and his thought content was unremarkable.  *Id.*  However, Mr. Gu found Plaintiff's memory erratic and inconsistent, and his intellect was below average.  *Id.*  He also found Plaintiff's attention distracted, and his impulse control, insight, and judgment poor.  *Id.*

**SOCIAL SECURITY ADMINISTRATION PROCEEDINGS**

After Plaintiff attained the age of eighteen years, the Social Security Administration (SSA) determined he was no longer disabled under adult SSI disability rules, as of July 1, 2011.  AR 111-20.  Plaintiff subsequently filed a request for reconsideration, which was denied on February 9, 2012.  AR 20, 121, 144.  On March 23, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 148.  ALJ Catherine L. Lazuran conducted a hearing on July 25, 2013.  AR 58-110.  Plaintiff testified in person at the hearing, along with his mother,

United States District Court
Northern District of California

Christina Sandoval.  *Id.*  Plaintiff was represented at the hearing by Donald Medearis, an attorney.

AR 58.  The ALJ also heard testimony from Vocational Expert Jose L. Chaparro.  AR 100-10.

**A.     Plaintiff's Testimony**

At the time of the hearing before the ALJ, Plaintiff was twenty years old.  AR 64.  He

testified he graduated from high school.  AR 66.  Plaintiff testified he could not read or write well,

and had been in special education classes since second grade.  AR 66.

As to work experience, Plaintiff testified he had last worked for "Anvil" in "Holly Courts,"

carrying heaters (weighing up to 80 pounds) and drilling holes to install them.  AR 67-68.  He

testified the work at Anvil was full-time work and lasted for about three months.  *Id.*  Plaintiff was

fired from Anvil after getting blamed for leaving a door open at a client's house.  AR 68-69.

Before Anvil, Plaintiff worked at San Francisco State University doing maintenance work,

"cleaning throughout the dorms when people were done living there."  AR 69.  He testified he did

the job for about one month, but left to work closer to home.  *Id.*  Although Plaintiff testified that

he did not work prior to the maintenance job, the ALJ pointed out a detailed earnings query,

showing he worked for the San Francisco Unified School District in 2009.  AR 70.  The ALJ

asked Plaintiff if he recalled what he did for them, but Plaintiff did not.  AR 70.  Plainitff

subsequently testified he did campaign work for San Francisco Mayor Ed Lee for about two or

three months, including putting up posters and flyers.  AR 70-71.  The work was "probably like

five hours" for "like two days a week."  AR 71.  He testified he had not looked for work since July

2011.  *Id.*

Plaintiff testified he had done volunteer work, since July 2011, with second through sixth

grade kids at the El Dorado Elementary School.  *Id.*  He worked as the assistant teacher, helping

the teacher bring water bottles to the kids and switching to the next classroom after class ended.

*Id.*  He testified that he supported a math class, a science class, and a reading class.  *Id.*  He

volunteered on Saturdays from 8:00 a.m. until 5:00 p.m.  AR 72.

The ALJ asked if Plaintiff could do any work now, to which he replied, "Yes."  AR 73.  To

the ALJ's question, "What kind of work do you think you could do?" Plaintiff replied,

"maintenance and mostly construction."  *Id.*  To the ALJ's question, "[D]o you think you could

work a 40-hour week?"  Plaintiff said, "Yes."  *Id.*  When asked why he had not looked for work, Plaintiff answered, "I'm not really sure, I've just been staying home, watching the kids because it's the summer and my mom, she goes to work."  *Id.*  Plaintiff testified he watched his nine-year-old brother and ten-year-old sister.  *Id.*  In addition to watching his younger siblings, Plaintiff testified he also watched his cousins, who were "about" eight and eleven years old.  AR 78.  Plaintiff also testified he looked for work before the summer, "trying to get into downtown Marshalls" as a stocker in the back.  AR 73-74.

When the ALJ asked if his health had gotten better or worse since 2011, Plaintiff replied, "Health-wise like – it become, I guess better.  I'm not really sure."  AR 74.  He testified he was not on any medications.  *Id.*  Plaintiff testified he did go to the emergency room once since July 2011, when he passed out at school after not eating anything all day.  *Id.*  He also testified he had not been in the hospital overnight since 2011, and that he had not been in any counseling or psychological treatment since July 2011.  AR 75-76.

Plaintiff testified he had anger management counseling in sixth grade, and he still had problems with anger "almost every day."  AR 76.  Plaintiff reported that he "just get[s] irritated off the easiest things, the simple things."  *Id.*  As a result, Plaintiff testified he leaves the room if somebody's talking to him, goes outside, stays outside for twenty to thirty minutes, and then comes back in.  *Id.*  He also testified he was able to control his anger at work, and he has usually been able to get along with other people in the last two years.  AR 76-77.

Plaintiff testified he has been able to get dressed and groomed on his own over the last two years.  AR 77.  He testified he does household chores, including vacuuming, taking out the trash, washing dishes, doing laundry, and sweeping or mopping if needed.  AR 77, 81.  Plaintiff testified he remembers to do his chores because his mother put a board in the kitchen with reminders for family members about what to do each day.  AR 85.  He forgets to do his chores most of the time, but his mother will remind him.  AR 85-86.  Although he does not cook, he does "simple" things, like make sandwiches.  AR 77.  Plaintiff had not been shopping for food in the last two years.  AR 78.  He also testified he does yard work, like cleaning up after dogs or pulling out the weeds, when he goes to his father's house.  AR 77-78.

1    Plaintiff testified he likes to walk a lot, and sometimes, when watching his little sisters and

2    cousins, he walks with them while they skate.  AR 78.  He testified he goes fishing with his uncle,

3    although had not done so in a while because his uncle was working.  AR 81.  He also attended

4    informal church gatherings at his cousin's house, played basketball with friends three times a

5    week, and was on a baseball team in his last year of high school.  AR 79-80.  He testified he has

6    friends and had dated in the last two years, although he did not have a girlfriend at the time.  AR

7    79.

8    Plaintiff testified he plays video games for about eight hours a day, but he does not like

9    computers.  AR 80-81.  He uses Facebook on his phone every day.  AR 81.  He also watches

10   television.  AR 82.  On a typical day, he plays video games, watches television, cleans up a little,

11   and goes outside.  AR 85.  He keeps appointments by either putting them in his phone or having

12   his mother remind him.  *Id.*

**B.    Christina Sandoval's Testimony**

13

14   Plaintiff's mother, Christina Sandoval, testified she has lived with the Plaintiff his whole

15   life.  AR 86-87.  She testified that besides Plaintiff, three other children live with her – a fifteen-

16   year-old boy, a ten-year-old girl, and a nine-year-old boy.  AR 87.  She testified Plaintiff

17   sometimes babysits his siblings by watching them in the morning or when she runs errands, and he

18   sometimes babysits his cousins.  AR 87-88.  When asked if he watches his siblings after school,

19   Plaintiff's mother testified, "I'm usually home by that time and my kids are in the after school and

20   they're in programs and stuff."  AR 89.

21   Plaintiff's mother testified he looked for work after graduating from high school.  AR 89.

22   When asked what kind of jobs he looked for, she responded:

23           Anything that's became available online and stuff like that he's
             asked me to help him with creating his resume and stuff like that.
24           So I created his resume and we've applied for certain things.  Oh,
             for example, like Marshalls stock, any job that I pretty much get into
25           I try to see if I could get him into it, too.

26   *Id.*  She also testified she helped Plaintiff get the job at Anvil.  *Id.*  Plaintiff's mother testified he

27   had worked at San Francisco State as a painter, but that was contracted through Anvil.  AR 91.

28   She testified she had been employed at the San Francisco Housing Authority as an administrative

United States District Court
Northern District of California

10

assistant and had suggested Plaintiff apply for jobs there, like installing windows.  AR 89-90.

Ms. Sandoval testified Plaintiff gets along with people in the family and others "somewhat"; she and the other family members know when he gets upset that he needs time to relax and be left alone.  AR 92.  She testified Plaintiff did not really converse much with other people outside the household.  *Id.*

As to chores, Plaintiff's mother testified Plaintiff takes out the trash, washes the dishes, and vacuums the living room.  *Id.*  She testified about a board in the kitchen with chore reminders for each of her children to do throughout the week, but she mostly she texts Plaintiff throughout the day to remind him to do chores.  AR 92-93.

Plaintiff's mother testified Plaintiff likes baseball a lot, but does not play it anymore because he is not in school; instead, he watches it.  AR 93.  She testified he likes video games and sometimes uses the computer at the Recreation Center, which is next door to her house.  AR 94.

Ms. Sandoval testified she did not think Plaintiff could handle a job as a dishwasher or on an assembly line, and that if he was given too many tasks on a job, he would not remember them.  AR 95.  However, she felt if he had a job just doing dishes, and was not asked to do anything else, he could handle it.  *Id.*

Plaintiff's mother testified that when Plaintiff was in school, he spent one more year in middle school than he was supposed to, and it took him five years to complete high school.  AR 95-96.  She testified that she met almost weekly with Plaintiff's IEP teacher to help him in school. AR 96.  She also testified Plaintiff had been in therapy, because he would get angry about his reading level not being on a par with other kids, and would "storm out of class."  *Id.*  The anger management therapy lasted until high school, when she and others finally got him to sit down and "work out of it."  *Id.*

**C.**     **Vocational Expert's Testimony**

The ALJ asked the vocational expert about Plaintiff's duties on the Anvil Job.  AR 104. The vocational expert responded, the job "appears to be commercial or institutional cleaner," which is described in the Dictionary of Occupational Titles (DOT), section 381.687-014, as heavy,

unskilled work with a special vocational preparation (SVP) level of 2.[6]  *Id.*

Next, the ALJ asked whether a hypothetical individual of Plaintiff's "age, education, and past relevant work experience," who "is able to do simple, routine tasks and some mildly detailed tasks, but not complex ones," could do the work Plaintiff did in the past.  AR 105.  The vocational expert replied that such a person could do Plaintiff's past work as a commercial institutional cleaner, and there were approximately 22,400 of those jobs in the national economy and 2,300 jobs in California.  AR 105-06.  The ALJ then asked whether a hypothetical individual, who is "able to do simple, routine, repetitive tasks and not detailed or complex ones, and does best at a low-pressured job, . . . not involving intense deadlines," be able to Plaintiff's past work.  AR 106.  The vocational expert replied, "Yes."  *Id.*  The ALJ then asked the vocational expert for examples of other jobs that the hypothetical person could do.  *Id.*  The vocational expert provided the following examples: (1) "House Cleaner," heavy and unskilled with an SVP of 2, DOT code 323.687-018, with 183,000 jobs nationally and 19,200 in California; (2) "Termite Exterminator Helper," heavy and unskilled work with an SVP of 2, DOT code 383.687-010, with 700 jobs nationally and 1,500 in California; and (3) "Landscape Laborer," heavy and unskilled with an SVP of 2, DOT code 408.687-014, with 68,000 jobs nationally and 8,300 in California.  AR 106-07.

After the ALJ's hypotheticals, Plaintiff's representative asked the vocational expert to consider a hypothetical individual, "age 20 with a high school diploma, but who was in Special Education, with no strength or postural limitations, who can do simple, repetitive tasks, but would be off task for 25 percent of the day compared to the average worker . . . with no detailed or complex tasks," and the need for a low-stress job.  AR 107-08.  The vocational expert replied that such a person would not be able to do the past work Plaintiff did, or any other work "existing in significant numbers in the national economy."  AR 108.

**D.     The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide for a five-

---

[6] SVP is defined in the Dictionary of Occupational Titles as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C.  An SVP of 2 corresponds to unskilled employment.

step sequential analysis to determine whether a Social Security claimant is disabled.[7]  20 C.F.R. §

404.1520.  The sequential inquiry is terminated when "a question is answered affirmatively or

negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer*

*v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential

inquiry, the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r*

*Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the

Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v.*

*Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

> Normally, the ALJ must first determine whether the claimant is performing "substantial
>
> gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), which would mandate that the claimant be found
>
> not disabled, regardless of medical condition, age, education, and work experience.  20 C.F.R. §
>
> 404.1520(b).  However, this step does not apply to individuals whose disability determinations are
>
> being reevaluated because they turned eighteen.  *See* 20 C.F.R. § 416.987(b).

> At step two, the ALJ must determine, based on medical findings, whether the claimant has
>
> a "severe"[8] impairment or combination of impairments as defined by the Social Security Act.  20
>
> C.F.R. § 404.1520(a)(4)(ii).  If no severe impairment is found, the claimant is not disabled.  20
>
> C.F.R. § 404.1520(c).  Here, the ALJ determined Plaintiff had the following severe impairments: a
>
> learning disorder and a dysthymic disorder.  AR 22.

> If the ALJ determines that the claimant has a severe impairment, the process proceeds to
>
> the third step, where the ALJ must determine whether the claimant has an impairment or
>
> combination of impairments that "meets or equals" an impairment listed in 20 C.F.R. Part 404,
>
> Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either meets
>
> the listed criteria for the diagnosis, or is medically equivalent to the criteria of the diagnosis, he is
>
> conclusively presumed to be disabled, without considering age, education and work experience.

---

[7] Disability is the "inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

[8] A "severe" impairment is "any impairment or combination of impairments which significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

United States District Court
Northern District of California

20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings.  AR 23.

Before proceeding to step four—if the impairment(s) "does not meet or equal a listed impairment"—the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to the most an individual can still do in a work setting, despite mental or physical limitations caused by impairments or related symptoms.  20 C.F.R. § 404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere.  20 C.F.R. § 404.1545(e).  Here, the ALJ determined that Plaintiff has the RFC to "perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform no detailed or complex tasks; and can perform simple routine, repetitive tasks without intense deadlines."  AR 24.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).  Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it.  20 C.F.R. § 404.1560(b)(1).  If the claimant has the RFC to do his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Here, the ALJ determined that Plaintiff could perform past relevant work as a commercial institutional cleaner.  AR 27.  Although the ALJ's findings in the first four steps of this sequential inquiry could establish Plaintiff failed to meet his burden of proof to demonstrate disability, *see Valentine*, 574 F.3d at 689, the ALJ proceeded to the fifth step to make alternative findings.  AR 27.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g); 404.1560(c).  The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  Here,

United States District Court
Northern District of California

14

based on the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform, including house cleaner, exterminator helper, and landscape laborer.  AR 27-28.

**E.     ALJ's Decision and Plaintiff's Appeal**

On August 30, 2013, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled as of July 1, 2011.  AR 28-29.  This decision became final when the Appeals Council declined to review it on November 18, 2014.  AR 1-5.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On July 23, 2015, Plaintiff filed the present Motion for Summary Judgment.  Dkt. No. 19.  On September 22, 2015, Defendant filed a Cross-Motion for Summary Judgment.  Dkt. No. 35.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The court must consider "the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion."  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ.  *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  *See Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  A court may not reverse an ALJ's decision on account of an error that is harmless.  *Molina v. Astrue*, 674 F.3d

1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56

(9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls upon the party

attacking the agency's determination.'"  *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409

(2009)).

## DISCUSSION

Plaintiff raises six arguments in support of his motion: (1) the ALJ's rejection of the

validity of Plaintiff's full scale IQ score of 69 was legal error and was not supported by substantial

evidence; (2) the ALJ's finding that Plaintiff did not meet Listing 12.05C was legal error and not

supported by substantial evidence; (3) the ALJ's rejection of consultative examining psychologist

Dr. Shertock's opinion as to Plaintiff's inability to maintain consistent concentration, persistence

and pace was legal error and not supported by substantial evidence; (4) the ALJ's rejection of Pan

Gu's opinion was legal error and not supported by substantial evidence; (5) the ALJ's

determination that Plaintiff could do his past relevant work was legal error and not supported by

substantial evidence; and (6) the ALJ's determination that Plaintiff could do other work was legal

error and not supported by substantial evidence.  AR 5-15.

**A.      IQ Score and Listing 12.05C**

Consultative psychologist Tania Shertock, Ph.D., examined Plaintiff in May 2011, and in

June 2011, reported his full scale IQ as 69 and diagnosed mild mental retardation.  AR 22, 367-70.

In the July 26, 2011 "Case Analysis," A. Mello noted that at the last favorable decision, Plaintiff's

IQ score was 73.  AR 391.  Plaintiff argues he meets the requirements for disability under Listing

12.05C based on Dr. Shertock's intelligence testing results and her diagnoses of his other mental

impairments.  Pl.'s Mot. at 5 (citing AR 177, 367-71).  In response, Defendant argues Plaintiff's

academic achievement and activities belied an IQ of 69, and, consequently, he did not meet

Listing 12.05C.  Def.'s Mot. at 3 (citing AR 24, 418).

1.      Legal Standard

As noted above, at step three in the sequential process, an ALJ must consider whether a

claimant's conditions meet or equal any of the impairments outlined in 20 C. F. R. Part 404,

Subpart P, Appendix 1, the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The Listing

of Impairments describes impairments that "would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). If a claimant's "impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also* 20 C.F.R. § 404.1520(d). The claimant bears the burden of establishing a prima facie case of disability under the Listing of Impairments. *See Thomas*, 278 F.3d at 955; *see also* 20 C.F.R. § 404.1520(a)(4)(iii).

An impairment meets a listing when all of the medical criteria required of that listing is satisfied. 20 C.F.R. § 404.1525(c)(3); *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."). "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ." *Id.* at 1099 (quoting 20 C.F.R. § 404.1526(a)). Medical equivalence should be based on medical findings and a "generalized assertion of functional problems is not enough to establish disability at step three." *Id.* at 1100.

Listing 12.05 refers to "intellectual disability" and defines it as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The listing provides four different ways for the claimant to prove intellectual disability. *Id.* Here, Plaintiff relies on subsection C, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

2.  Application to the Case at Bar

Dr. Shertock administered testing on May 26, 2011, when Plaintiff was eighteen years old. AR 367. In addition to the IQ score of 69, Dr. Shertock also diagnosed Plaintiff with Posttraumatic Stress Disorder and Dysthymic Disorder. AR 369-70. Based on these findings, it appears Plaintiff could meet the requirements for establishing an impairment under Listing

17

12.05C.  However, the ALJ found the evidence fails to establish the criteria under 12.05C because Plaintiff "is able to function outside his home, he does not live in a highly supportive living arrangement and there is no evidence that he has a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate."  AR 23.  The ALJ also noted that, despite being described as having a full scale IQ of 69, Plaintiff graduated from high school and attended both general and special education classes.  AR 23.  Additionally, Plaintiff's "school records do not contain psychological tests that corroborate a diagnosis of mild mental retardation" or an IQ of 69, and his grades are inconsistent with mild mental retardation.  AR 23-24.  The ALJ pointed out that Plaintiff last received counseling in 2009 and his ability to interact with others and manage his anger had improved significantly since that time.  AR 25.  He also became eligible to play on the school baseball team based on improved behavior and grades, and he testified he had no difficulty controlling his anger at work.  AR 25.  The ALJ also looked at Plaintiff's activities, including playing basketball three times a week, playing videogames, using Facebook, taking public transit, going to the movies, doing household chores, caring for his younger siblings and cousins, and volunteering as a teaching assistant.  *Id.*

In an unpublished decision, the Ninth Circuit has stated that it "do[es] not doubt" that an ALJ can decide an IQ score is invalid, but also noted that it has "never decided what information is appropriately looked to in deciding validity" of an IQ score.  *Thresher v. Astrue*, 283 Fed. App'x 473, 475 n.6 (9th Cir. 2008).  In *Thresher*, the court recognized other decisions have emphasized that a score can be questioned on the basis of "other evidence," and that other courts require "some empirical link between the evidence and the score."  *Id.* at 495 n.6 (citations omitted).  Consequently, some circuits have allowed the ALJ to use several factors in assessing the validity of test results.  *See Clay v. Barnhart*, 417 F.3d 922, 929-30 (8th Cir. 2005) (holding an ALJ is free to disregard a low IQ score where the evidence showed substantial malingering and daily activities inconsistent with the level of impairment alleged); *Soto v. Sec'y*, 795 F.2d 219, 222 (1st Cir. 1986) (holding an ALJ need not accept the IQ score if there is a substantial basis for believing that plaintiff is feigning results).  Other circuits have allowed an ALJ to discredit a test

18

result when inconsistencies between tests indicated a high possibility of malingering. *See Burchfield v. Astrue*, 2011 WL 5975764, at *4 (D. Ariz. Nov. 30, 2011) (evidence that claimant did not make a serious effort in testing may properly be considered when determining validity of an IQ score); *Popp v. Heckler*, 779 F.2d 1497, 1499–1500 (11th Cir. 1986).

Here, the Court finds the ALJ properly disregarded the IQ score of 69 based on Plaintiff's activities.  As the ALJ noted, Plaintiff graduated from high school and earned passing grades, including Cs in physical education and integrated science; Bs in geometry, American literature, and study skills; and an A in United States history.  AR 24, 418.  High school records indicated that his ability to interact with others and control his anger and frustration improved significantly as he progressed toward graduation.  AR 25.  Plaintiff made significant progress in his junior year, passing all of his classes in the fall semester.  AR 25, 419, 427.  Plaintiff became eligible to play on the school baseball team because he improved his behavior and grades.  AR 25, 419.  At one point, he considered enrolling in a college or a vocational program after graduating, but he chose to work at Anvil Builders from June to September 2012.  AR 25, 265-71, 426.  At the hearing in July 2013, Plaintiff testified he had no difficulty controlling his anger at work.  AR 25, 76-77.

Consistent with this record, Plaintiff also testified that, in the last two years, he got along with others.  AR 25, 77.  He said he had friends and had dated within the last two years.  AR 25, 79.  He also stated he played basketball three times a week, played videogames for hours on end ("Mostly my whole day"), used public transit frequently, went to the movies, and used Facebook.  AR 25, 80-81.  He testified he did household chores and cared for his younger siblings, who were nine and ten, as well as his two younger cousins, who were eight and eleven.  AR 25, 73, 77-79, 81.

Plaintiff explained that he performed volunteer work, as an assistant teacher, after cessation of benefits in July 2011.  AR 25, 71-72.  He admitted the ability to do maintenance and construction work.  AR 73.  He said he was currently not looking for work because he was staying home and watching his younger siblings over the summer.  AR 26, 73.  He testified he had not looked for work since July 2011, but admitted that, before summer, he had looked for work as a "stocker."  AR 26, 73-74.  He opined that, since July 2011, he could do a job like the one he did

United States District Court
Northern District of California

19

1   with Anvil and could probably do a babysitting job.  AR 25-26, 82-83.

2          Plaintiff argues the ALJ's assessment of his academics and activities are incorrect.  Pl.'s

3   Mot. at 7-9.  Although Plaintiff admitted doing volunteer work, he only did it five to eight hours a

4   week, and the tasks he described were very simple, such as putting up posters or flyers as part of a

5   mayoral campaign or, when assisting an elementary school teacher, bringing water bottles to

6   children or moving the children to another classroom.  Pl.'s Mot. at 8 (citing AR 70-71).  As to

7   babysitting, Plaintiff and his mother testified he watched his siblings and cousins, but he was not

8   paid.  *Id.* (citing AR 73, 78-79, 87-89).  As to using a computer, Plaintiff testified he was "terrible

9   with computers, don't like them."  *Id.* at 9 (citing AR 81.  As to playing sports, Plaintiff testified

10  he played on a baseball team for one year during his last year of high school, but he noted "there

11  was no testimony as to details, like what position he played, or how well he performed."  *Id.*

12  (citing AR 80).  And while he testified he played basketball, it was "informally with friends, three

13  times a week, but with no further detail."  *Id.* (citing AR 80).  However, Plaintiff's alternative

14  view does not refute the ALJ's assessment.  *See, e.g.*, *Burch v. Barnhart*, 400 F.3d 676, 679 (9th

15  Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

16  conclusion that must be upheld.");  *Magallanes*, 881 F.2d at 750 (any ambiguities are to be

17  resolved by the ALJ).  Plaintiff's academic achievement and activities were legitimate reasons to

18  doubt the IQ score of 69, and therefore find that he did not meet Listing 12.05C.  *See* 20 C.F.R. Pt.

19  404, Subpt. P, App. 1 § 12.05C; *Lax v. Astrue*, 489 F.3d 1080, 1087 (10th Cir. 2007) (concluding

20  it is proper for the ALJ to consider the entire record when determining whether an IQ score is

21  valid, i.e., the score is "an accurate reflection of [a claimant's] intellectual capabilities"); *Mallough*

22  *v. Astrue*, 2009 WL 982795, at *14 (W.D. Pa. Apr. 9, 2009) (concluding the "ALJ did not err by

23  finding that the results of [the doctor]'s test did not accurately reflect [the claimant]'s intellectual

24  abilities," and, thus, he "did not satisfy Listing 12.05C" as the claimant's high school grades and

25  the levels of function in his activities of daily living were inconsistent with a doctor's diagnosis of

26  mild mental retardation, and were therefore legitimate record evidence to consider in deeming the

27  doctor's IQ test invalid).

28          Based on this analysis, the Court finds no legal error in the ALJ's decision finding Plaintiff

20

1    did not meet the requirements of Listing 12.05C.

2    **B.     Medical Opinions**

3            The ALJ gave Dr. Shertock's opinion "little weight," finding her examination of Plaintiff

4    did not support her opinion, and moreover, Plaintiff's activities contradicted it.  AR 26.  The ALJ

5    also gave the opinion of Pan Gu, LCSW, little weight because it was largely based on reporting by

6    Plaintiff and his mother, whom the ALJ found not fully credible.  *Id.*  Plaintiff argues it was legal

7    error for the ALJ to reject these opinions.  Pl.'s Mot. at 12-14.

8            1.     Legal Standard

9            When determining whether a claimant is disabled, the ALJ must consider each medical

10   opinion in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b);

11   *Zamora v. Astrue*, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  In deciding how much

12   weight to give to any medical opinion, the ALJ considers the extent to which the medical source

13   presents relevant evidence to support the opinion.  *See* 20 C.F.R. § 416.927(c)(3).  Generally,

14   more weight will be given to an opinion that is supported by medical signs and laboratory

15   findings, provides supporting explanations for opinions, and is consistent with the record as a

16   whole.  20 C.F.R. § 416.927(c)(3)-(4).

17           In conjunction with the relevant regulations, the Ninth Circuit "developed standards that

18   guide [the] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*,

19   528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the

20   opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2)

21   those who examine but do not treat the claimant (examining physicians); and (3) those who neither

22   examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830

23   (9th Cir. 1995).  "By rule, the Social Security Administration favors the opinion of a treating

24   physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing

25   20 C.F.R. § 404.1527(c)(2)).  If a claimant has a treatment relationship with a provider, and

26   clinical evidence supports that provider's opinion and is consistent with the record, the provider's

27   opinion will be given controlling weight.  20 C.F.R. § 416.927(c)(2).  "The opinion of a treating

28   physician is given deference because 'he is employed to cure and has a greater opportunity to

United States District Court
Northern District of California

21

know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the [Social Security] Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record.

*Id.* (citing 20 C.F.R. § 404.1527(c)(3)-(6)).  Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See Orn*, 495 F.3d at 632 (citing SSR 96–2p,[9] 1996 WL 374188, at *4 (July 2, 1996)).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p at *4.

### 2.    Application to the Case at Bar

#### a.    *Dr. Shertock*

There appears to be no dispute Dr. Shertock is Plaintiff's treating physician.  In the ALJ's opinion, the she noted Dr. Shertock's functional limitations findings, including that Plaintiff "would be able to perform simple repetitive tasks, but not on a sustained basis," and he "may have difficulty adapting to work stress and changes and would have difficulty maintaining a schedule

---

[9] "[Social Security Rulings] do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20 C.F.R. § 402.35(b)(1).  The Ninth Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations." *Chavez v. Dep't. of Health and Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996).

United States District Court
Northern District of California

on a consistent basis." AR 22-23, 368.  However, the ALJ also observed, "upon mental status examination, [Plaintiff] had a full affect, logical thought process and intact memory, maintained persistence in all activities, was not distracted[,] and completed serial threes." AR 23, 368.  The ALJ also noted Dr. Shertock diagnosed Posttraumatic Stress Disorder, yet Plaintiff did not allege such a disorder, and Dr. Shertock did not explain what her basis was for such a diagnosis.  AR 23, 26, 369.  The ALJ also noted Dr. Shertock "did not gather much information about [Plaintiff]'s activities, which is part of the reason Dr. Shertock's report is not persuasive." AR 26.  As discussed above, the ALJ considered other evidence in the record, including the evidence of Plaintiff's activities, and found it was not consistent with Dr. Shertock's opinion.  AR 23, 370. The inconsistency between Dr. Shertock's mental status findings and opined limitations, as well as her failure to reconcile her opinion with Plaintiff's activities, were sound reasons to reject her opinion.  *See* 20 C.F.R. § 416.927(c)(2) (providing for consideration of medical opinions that are inconsistent internally or inconsistent with other evidence); *Johnson v. Shalala*, 60 F.3d 1428, 1432-33 (9th Cir. 1995) (holding the ALJ may disregard even a treating physician's opinion when it is internally inconsistent); *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (concluding internal inconsistencies and ambiguities within doctor's opinion provided specific and legitimate reasons for ALJ to reject opinion); *Valentine*, 574 F.3d at 692-93 (holding a contradiction between treating physician's opinion and his treatment notes constitutes a specific and legitimate reason for rejecting treating physician's opinion); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (concluding incongruity between medical records and opinion provided a specific and legitimate reason for rejecting treating physician's opinion); *Rollins*, 261 F.3d at 856 (holding the ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports); *Fisher v. Astrue*, 429 F. App'x 649, 652 (9th Cir. 2011) (concluding that conflict between a doctor's opinion and the claimant's daily activities was a legally sound reason to discount the opinion).

While Plaintiff may disagree with the ALJ's findings, the Court finds this record constitutes substantial evidence supporting the ALJ's decision not to give Dr. Shertock's opinion controlling weight.  Further, even "where the evidence is susceptible to more than one rational

interpretation," the Court must uphold the ALJ's decision.  *Magallanes*, 881 F.2d at 750; *see also*

*Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Tackett v.*

*Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) ("When evidence reasonably supports either

confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the

ALJ.").  The ALJ must resolve determinations of credibility, conflicts in medical testimony, and

all other ambiguities.  *Batson*, 359 F.3d at 1196; *Magallanes*, 881 F.2d at 750.

> b.     *Pan Gu, LCSW*

As to Pan Gu's behavioral assessment, the ALJ gave it little weight "because it was largely

based on reporting by [Plaintiff] and his mother and they are not fully credible."  AR 26.  The ALJ

also found Pan Gu's diagnosis "ambiguous."  *Id.*  Plaintiff argues Pan Gu's mental status findings

are consistent with the records, and the ALJ therefore erred in not accepting Gu's assessment.

Pl.'s Mot. at 13 (citing AR 433).

As a licensed clinical social worker, Pan Gu is not an "acceptable medical source."  *See* 20

C.F.R. §§ 404.1513(a).  An opinion from a person who is not an "acceptable medical source" need

not be afforded any deference by the ALJ.  *See Bunnell v. Sullivan*, 912 F.2d 1149, 1152 (9th Cir.

1990), *rev'd en banc on other grounds*, 947 F.2d 341 (9th Cir. 1991).  However, pursuant to SSR

06-3p, SSA recognizes that other medical sources, such as "licensed clinical social workers, have

increasingly assumed a greater percentage of the treatment and evaluation functions previously

handled primarily by physicians and psychologists," and their opinions "are important and should

be evaluated on key issues such as impairment severity and functional effects, along with the other

relevant evidence in the file."  SSR 06-03p, 71 Fed. Reg. 45593, 45595 (Aug. 9, 2006).  SSR 06-

3p explains that such opinions will be assessed using the regulatory factors for evaluating medical

opinions.  *Id.* at 45596 (citing 20 C.F.R. §§ 404.1527, 416.927).

> [T]he adjudicator generally should explain the weight given to opinions from
> these "other sources," or otherwise ensure that the discussion of the evidence in
> the determination or decision allows a claimant or subsequent reviewer to follow
> the adjudicator's reasoning, when such opinions may have an effect on the
> outcome of the case.

*Id.*

24

Here, the ALJ considered Pan Gu's assessment under SSR 06-3p.  AR 26.  Thus, the Court must determine whether the ALJ's stated reasons for giving the opinion little weight are legally correct and supported by the record.

### i.    Plaintiff's Credibility

Plaintiff does not address his own credibility in his motion.  However, having reviewed the record, the Court finds the ALJ properly rejected Plaintiff's testimony with specific, clear and convincing reasons for doing so.  AR 22-29.

When determining whether a claimant's testimony regarding their subjective pain or symptoms is credible, a two-step analysis is used.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc); 42 U.S.C. § 423(d)(5)(A)).  A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).

Second, if the claimant has met the first step and "there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281).  "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen*, 80 F.3d at 1284.  Courts must not engage in second-guessing, where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record."  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  However, "a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (per curiam), *superseded by statute on other grounds as recognized in* Bunnel, 912 F.2d at 1154

1   (9th Cir.1990) ("'Excess pain' is, by definition, pain that is unsupported by objective medical

2   findings.").

3          Factors that an ALJ may consider in weighing a claimant's credibility include:

4   "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or

5   between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and

6   testimony from physicians and third parties concerning the nature, severity, and effect of the

7   symptoms of which [claimant] complains." *Thomas*, 278 F.3d at 958-59 (quoting *Light*, 119 F.3d

8   at 792).  An ALJ's credibility finding must be properly supported by the record, and sufficiently

9   specific to ensure a reviewing court he did not "arbitrarily discredit" a claimant's subjective

10  testimony.  *Thomas*, 278 F.3d at 958 (citing *Bunnell*, 947 F.2d at 345-46).  An ALJ may consider

11  "whether the claimant engages in daily activities inconsistent with the alleged symptoms."

12  *Molina*, 674 F.3d at 1112.

13         As discussed above, the ALJ found Plaintiff's daily activities were "fairly extensive" and

14  demonstrated his ability to work.  AR 25-26.  Plaintiff graduated from high school and earned

15  passing grades, improved his ability to interact with others and control his anger and frustration,

16  became eligible to play on the school baseball team, had friends and had dated within the last two

17  years, played basketball three times a week, played videogames for hours on end, used public

18  transit frequently, went to the movies, used Facebook, performed household chores, and cared for

19  his younger siblings and cousins.  AR 24-26.  Such activities are inconsistent with allegations of

20  disability.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (concluding the

21  ALJ's reasons for discrediting claimant's testimony were sufficient when he said the "record

22  reflects that the claimant has normal activities of daily living, including cooking, house cleaning,

23  doing laundry, and helping her husband in managing finances. . . . These activities tend to suggest

24  that the claimant may still be capable of performing the basic demands of competitive,

25  remunerative, unskilled work on a sustained basis."); *Mayes v. Massanari*, 276 F.3d 453, 457, 461

26  (9th Cir. 2001) (concluding claimant's "testimony that she could do many daily activities,"

27  including watching television, straightening up her house, and shopping, "suggested that she could

28  also work").  The Court therefore finds the ALJ did not err in discrediting Plaintiff's testimony.

United States District Court
Northern District of California

26

*ii.      Christina Sandoval's Testimony*

Plaintiff argues the ALJ committed error because Ms. Sandoval's testimony is consistent with Dr. Shertock's opinion that Plaintiff appears unable to maintain consistent concentration and persistence to perform even simple repetitive tasks, and the ALJ therefore needed to provide specific reasons for rejecting Ms. Sandoval's testimony. Pl.'s Mot. at 14 (citing AR 370).

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (citations and quotation marks omitted). The ALJ must provide specific reasons, "germane to each witness," to reject the testimony of a lay witness. *Id.* (citations and quotation marks omitted). If an ALJ fails to do so, "a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout*, 454 F.3d at 1056.

Here, the ALJ specifically considered Ms. Sandoval's testimony. AR 26-27. The ALJ gave Plaintiff's mother's statements some weight—but less than full weight—"because they are not fully supported by the evidence of [Plaintiff]'s activities and his testimony." AR 26. The ALJ noted Ms. Sandoval testified, Plaintiff babysat his cousins and siblings, "had good attendance when he worked," and "could work as a dishwasher if he did not have to multitask." AR 26-27. In addition, the record contains inconsistencies between Plaintiff's and his mother's testimony. For example, Ms. Sandoval testified Plaintiff was fired from Anvil because he was "not able to move as fast as the other employees." AR 25, 98. Yet Plaintiff himself testified that, since July 2011, he could perform work like he did for Anvil. AR 25-26, 82). These inconsistencies provide a valid reason to reject Ms. Sandoval's testimony. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) ("the ALJ may expressly disregard lay testimony if the ALJ 'gives reasons germane to each witness for doing so'") (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)). Further, to the extent Plaintiff may argue his mother's testimony indicated limitations not specifically discussed by the ALJ, such limitations are accounted for elsewhere in her decision. Thus, the ALJ's failure to address such limitations in the context of Ms. Sandoval's testimony is harmless error. *Moore v. Astrue*, 2011 WL 1792851, at *6-7 (C.D. Cal. May 11, 2011) (holding

United States District Court
Northern District of California

1    ALJ's failure to address lay testimony regarding limitations already accounted for in his decision

2    is harmless error when the plaintiff failed to demonstrate how this would have changed the RFC);

3    *Zerba v. Comm'r of the Soc. Sec. Admin.*, 279 F. App'x 438, 440 (9th Cir. 2008) (If the third party

4    testimony does not introduce new evidence and is merely duplicative, the ALJ does not err by

5    failing to evaluate the testimony).

6        Based on this analysis, the Court finds the ALJ properly discredited Plaintiff's credibility

7    and gave his mother's statements some, but not full, weight.  AR 26.  As such, the ALJ properly

8    gave Pan Gu's assessment little weight.  *Id.*

9    **C.    ALJ's Determination that Plaintiff Could Perform Past Work and Other Work**

10       Finally, Plaintiff argues the ALJ erred in determining he could perform his past relevant

11   work as well as other work.  Pl.'s Mot. at 14-15.  As to past relevant work, Plaintiff maintains the

12   ALJ's decision is not supported by substantial evidence because she failed to take into account

13   Ms. Sandoval's testimony that Plaintiff was let go from his job at Anvil "because he did not work

14   fast enough."  *Id.* at 14 (citing AR 25).  Plaintiff also maintains the decision is based on legal error

15   because the ALJ rejected Dr. Shertock's opinion.  Reply at 6, Dkt. No. 27.  As to the ALJ's

16   decision regarding other work, Plaintiff contends it was legal error for the ALJ to reject the

17   opinions of Dr. Shertock and Pan Gu.  Pl's Mot. at 15.

18       As explained above, the ALJ's reasons for giving Dr. Shertock's and Pan Gu's opinions

19   little weight are legally correct and supported by substantial evidence in the record.  As to Ms.

20   Sandoval's testimony, the Court also explained that the ALJ properly gave her testimony some,

21   but not full, weight, because it is not fully supported by Plaintiff's activities and his own

22   testimony.  Regardless, the RFC reflected Ms. Sandoval's testimony concerning Plaintiff's limited

23   functioning in a work environment.  AR 24-26, 97-98.  A limitation to work, with no intense

24   deadlines, adequately accommodates her statement as to Plaintiff's speed on the Anvil job.  *See* 20

25   C.F.R. § 416.946(c) (the ALJ—not any doctor or social worker—is responsible for assessing

26   residual functional capacity); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008)

27   (concluding the ALJ may synthesize and translate assessed limitations into residual functional

28   capacity).  The vocational expert testified that such a limitation did not preclude such work or the

United States District Court
Northern District of California

28

other jobs identified at step five.  AR 22-28, 104-07; *see Bayliss v. Barnhart*, 427 F.3d 1211, 1217

(9th Cir. 2005) (holding the ALJ's reliance on the vocational expert's responsive testimony "was

proper" because the hypothetical question the ALJ posed to the vocational expert "contained all of

the limitations that the ALJ found credible and supported by substantial evidence in the record").

Finally, Plaintiff himself testified he could do his past relevant work.  AR 82-83.  Accordingly, the

Court finds the ALJ's decision that Plaintiff could perform past relevant work, as well as other

work, is free of legal error and supported by substantial evidence.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion for Summary

Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: February 8, 2016

_____

MARIA-ELENA JAMES
United States Magistrate Judge